IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 31, 2021

**STATE OF TENNESSEE v. BRISTON J. SMITH, JR.**

**Appeal from the Criminal Court for Hamilton County**
**No. 296100   Barry A. Steelman, Judge**

———————————————————

**No. E2020-00823-CCA-R3-CD**

———————————————————

Following a trial, a jury convicted Briston J. Smith, Jr., ("Defendant") of first degree felony murder and attempted especially aggravated robbery, for which he received an effective life sentence. On appeal, Defendant contends: (1) the evidence is insufficient to support his convictions; (2) the trial court erred in denying his motion to suppress his statements to law enforcement; (3) the trial court abused its discretion in admitting autopsy and life photographs of the victim; and (4) he is entitled to a new trial based on improper prosecutorial argument. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

William M. Speek (on appeal), and Brian Pearce and Rip Biggs (at trial), Chattanooga, Tennessee, for the appellant, Briston J. Smith, Jr.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and AnCharlene Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On the evening of March 2, 2015, Charles Holsey ("the victim") was shot and killed during a drug deal in Chattanooga. In August 2015, the Hamilton County Grand Jury subsequently indicted Defendant and two co-defendants, Robert Henry Thompson and

Abram Thomas Young, Jr., for first degree felony murder and attempted especially aggravated robbery in connection with the victim's death. The co-defendants' cases were severed and set separately from Defendant's trial.

## Motions to Suppress Statements

On February 21, 2017, Defendant filed a motion to suppress his statements to police "pursuant to his right to counsel under the Fifth Amendment of the United States [C]onstitution" and "his Fifth Amendment right to remain silent." In this first motion to suppress, Defendant contended that he invoked his right to remain silent and his right to an attorney at a time stamp of 52:27 on the recording of his interview with detectives when he stated, "I'm done talking," but that detectives continued the interrogation. At a pretrial hearing, defense counsel explained that he had requested suppression of Defendant's entire statement based on this alleged constitutional violation. Defense counsel stated, however:

> I think in doing additional research I can't find . . . any authority that would allow that. I think that the only evidence that could be suppressed would be after that 52:27 mark. And so I think that . . . based on the correspondence I've had with [the prosecutor], I don't think the State intends to use that.

Based on this announcement, the trial court stated that it would grant Defendant's motion to suppress in part and ruled that the recorded interview should be redacted at the 52:27 mark and that anything after that time was inadmissible.

Apparently, Defendant filed a second motion to suppress his statements on June 12, 2017,[1] asserting that detectives had violated his right to counsel under the Sixth Amendment by interviewing him after his arrest on a warrant charging him with the instant offenses. At a hearing on the second motion to suppress, Defendant argued that he was not required to make an unequivocal invocation of his right to counsel under the Sixth Amendment. He asserted that, prior to his arrest and interview, detectives had been made aware that he intended to hire an attorney and that he did not wish to speak to law enforcement without the presence of counsel. Defendant contended that, at the time detectives provided *Miranda* warnings, they knew or should have known that he had invoked his right to counsel.

Detective Christopher Blackwell of the Chattanooga Police Department (CPD) testified at the hearing that he investigated the victim's murder in March 2015. He explained that Defendant became a suspect in the investigation of the victim's shooting

---

[1] A copy of the second motion to suppress is not included in the record, but it was the subject of an evidentiary hearing held the day before trial.

after the victim's girlfriend, Kortnee Thompson, told police that the victim had been text messaging with someone named "B.J.," whom police determined was Defendant. Detective Blackwell stated that the shooting took place in the victim's car, a black BMW, and that fingerprints were recovered from the car. He said that Defendant's "left pinky fingerprint" was found on the passenger-side rear door handle.

Detective Blackwell testified that Ms. Thompson was inside the victim's car when the shooting took place. Ms. Thompson told detectives that two assailants were in the back seat of the victim's car negotiating a purchase of marijuana from the victim when one of the assailants tried to grab the marijuana. She said that "a scuffle broke out" and that the suspect sitting in the rear passenger-side seat told the other suspect to "[s]hoot him." Ms. Thompson said that the shooter had been sitting behind the victim in the rear driver side seat of the car.

Detective Blackwell explained that, the day after the homicide, he took out a warrant for Defendant's arrest after Defendant's fingerprint was identified, charging Defendant with first degree murder, aggravated assault, reckless endangerment, and felony possession of a firearm. Detective Blackwell said that, on March 5, 2015, Defendant was located at the home of his brother in Georgia and arrested by Investigator Tim Pickard with the CPD's fugitive division. Defendant was then transported to the Catoosa County Jail. Additionally, because marijuana was found inside the home, Defendant's brother, Jermichael Prater, and Mr. Prater's girlfriend, Janae Dave, were also arrested and transported to the jail. Defendant's mother, Alisa Smith, was also at Mr. Prater's home, but she was not arrested.

Detective Blackwell testified that he first talked to Ms. Smith outside of Mr. Prater's home. He said that she gave no indication that Defendant had an attorney or that Defendant would not talk to him. He recalled, however, that she invoked her own right to counsel, at which time he ended the interview. Detective Blackwell then interviewed Ms. Dave and Mr. Prater at the jail. He stated that Ms. Dave did not make any reference to an attorney during her interview. Detective Blackwell testified that Mr. Prater never indicated during his interview that Defendant had an attorney or intended to invoke his right to counsel. Mr. Prater said that "the family had talked about an attorney and that [Mr. Prater] wanted one to make a deal" for himself on the drug charges. Mr. Prater told Detective Blackwell that he had instructed Defendant to "tell the truth."

Detective Blackwell explained that he then interviewed Defendant at the jail and that the interview was recorded. He testified that Defendant signed a *Miranda* rights waiver form and agreed to speak about what happened. Detective Blackwell read each of the constitutional rights on the waiver form to Defendant, and Defendant read the form for himself as well. Defendant indicated that he understood those rights, placing his initials

beside each one. Defendant then signed the form, agreeing to waive his rights. Detective Blackwell stated that Defendant was not threatened or coerced to provide a statement and that Defendant did not appear to be under the influence of narcotics or alcohol at the time of the interview. Detective Blackwell testified that Defendant never indicated that he had an attorney or that he intended to invoke his right to an attorney if questioned. Defendant's recorded interview was then played for the court.

During the interview, Defendant said that he could read and write and that he finished the 11th grade. Detective Blackwell reviewed the *Miranda* waiver with Defendant, going over each point carefully. Detective Blackwell specifically told Defendant that if he wanted to talk and did not want a lawyer present, he should sign the waiver. After Defendant signed the waiver, both Detective Blackwell and another officer in the room reiterated that if Defendant did not understand something, he should just ask. Detective Blackwell also told Defendant that he could read over the waiver again. Detective Blackwell then asked again if Defendant understood, and Defendant said that he understood his rights.

Defendant explained that his plan had been "to get the weed from the guy." Defendant said that Co-Defendant Young pulled a gun out and demanded the drugs but that the victim refused to comply. Defendant said that he turned his back to walk back to Co-Defendant Thompson's car and heard gunshots. He stated that he saw Co-Defendant Young pointing the gun at the victim. Defendant said that he was there to play his part in the robbery and that he had to be a "man" but claimed that he was not there to kill the victim. Defendant explained that Co-Defendant Thompson knew they were going to rob the victim because of the text messages. Defendant said that the agreed price for the marijuana had been $160 but explained that he had no money and that Co-Defendant Young only had $100. Defendant stated that Co-Defendant Young was in control but admitted that it had been his idea to rob the victim.

On cross-examination, Detective Blackwell agreed that Defendant invoked his right to counsel at the 52:27 mark of the recording. At this point, the trial court stated that it had heard enough to rule on the second suppression motion. However, Defendant wanted to play the redacted portion of the interview as well, arguing that it was relevant because it showed that the detectives "weren't going to stop just because [Defendant] wanted an attorney." The trial court then listened to the redacted version of the recorded interview.

Upon additional cross-examination, Detective Blackwell agreed that, at the 18:15 time stamp, Defendant mumbled to himself "let me stop talking," but Detective Blackwell explained that the comment was not directed at him. Detective Blackwell recalled, "It wasn't a direct expression toward us to stop talking." Detective Blackwell agreed that, at about thirty-nine minutes into the recording, Defendant "mention[ed] that he and his family

were trying to get an attorney before he had to come in there and talk" to police. Detective Blackwell acknowledged that he did not attempt to clarify whether Defendant was requesting an attorney or not. He agreed that, at the time stamp of 52:27, Defendant said, "I'm done talking" and said that he "need[ed] a lawyer" at 57:45. Detective Blackwell ended the interview at that point.

On redirect examination, Detective Blackwell testified that, when he interviewed Defendant, he did not think that Defendant had an attorney. He said that, in speaking to Ms. Smith, he "got the impression that she wanted a lawyer for herself before she would continue to speak" and that Mr. Prater "mentioned that the family had talked about a lawyer, but that was it." Detective Blackwell continued, "They had not mentioned that they're going to get one. They did not mention a name of a lawyer. They did not mention that they were going [to] . . . call one. They had just . . . talked about it." Detective Blackwell reiterated that, when he began his interview with Defendant and provided *Miranda* warnings to him, Defendant did not mention having an attorney.

Defendant's mother, Alisa Smith, testified that she was at Mr. Prater's Georgia home when police arrested Defendant, Mr. Prater, and Ms. Dave. She said that, prior to their arrest, the group had been talking about "[k]ind of what happened and us needing – and him needing an attorney." Ms. Smith explained that she had attempted to contact her sister, who was an attorney. She said that, when Defendant was being handcuffed, she yelled to him that he "needed representation" and that she was going to call her sister. Defendant told Ms. Smith to stop crying and that everything would be okay. Ms. Smith told Defendant that she was "trying to get [her] sister and [attorney Stuart Brown] on the phone."[2] She testified that she heard Defendant tell police that he wanted an attorney. She explained that, after Defendant's arrest, Investigator Pickard asked her to speak to Detective Blackwell. She stated that she told Investigator Pickard about her sister and Mr. Brown.

On cross-examination, Ms. Smith stated that Defendant was eighteen years old at the time of his arrest and that it was his first arrest. She said that, although he had not yet graduated high school, he knew how to read and write and that he was capable of "mak[ing] his own decisions." Ms. Smith recalled that she had arrived at Mr. Prater's home about thirty minutes before Chattanooga police. She stated that, after Defendant was transported to the jail, she had a casual conversation with Investigator Pickard in the living room and that she told him, "We need an attorney." Ms. Smith testified that she had spoken to her sister prior to going to see Defendant in Georgia and that her sister told her, "Make sure he does not talk . . . to the police. Tell the truth to the attorney."

---

[2] Ms. Smith explained that Mr. Brown had previously worked with her sister and that they eventually retained him to represent Defendant at his preliminary hearing.

Ms. Smith agreed that she later spoke to Detective Blackwell in a recorded interview in a police car outside Mr. Prater's home. She acknowledged that, during this interview, she did not mention her sister to the detective or say anything about Defendant needing an attorney. She stated, however, that she told Detective Blackwell that she needed representation if she was going to continue to answer his questions. Ms. Smith agreed that her interview with Detective Blackwell occurred after Defendant was transported to the jail. She agreed that she never mentioned the names of any attorneys or said that Defendant wanted an attorney.

At the conclusion of the hearing, the trial court ruled that Defendant's invocation of his rights later in the recorded interview indicated that he knew how to invoke such rights. The trial court noted that there was a conflict in the testimony between Detective Blackwell and Ms. Smith regarding whether Defendant said that he wanted an attorney at the time of his arrest. It found that Detective Blackwell "was adamant that there was never any invocation of the right to counsel that was made to him by [D]efendant." The court accredited the testimony of Detective Blackwell based on the "objective evidence" of Defendant's recorded interview. Defendant was carefully and repeatedly explained his constitutional rights, and he agreed to waive them. He asserted that he wanted an attorney over fifty minutes into the interview. The trial court further found that Ms. Smith did not tell Detective Blackwell that Defendant wanted an attorney during her recorded interview. The court stated, "I don't find that there was an invocation of the right to counsel, the desire to have counsel present to the interrogators or to anyone else to the extent that it put the burden on the police not to initiate communication." The court concluded that Defendant waived his rights under the Sixth Amendment by executing a knowing and voluntary *Miranda* waiver and denied the second motion to suppress.

**Motion to Exclude Photographs**

In a pretrial motion, Defendant challenged the admissibility of the victim's autopsy photographs. Prior to the medical examiner's testimony at trial, the trial court took up the issue during a jury-out hearing. Defendant argued that he was not challenging the cause of the victim's death, and therefore, the photographs of the victim's gunshot wounds were unfairly prejudicial. Defendant admitted, however, that the photographs were not "particularly gruesome." Deputy Chief Medical Examiner for the Hamilton County Medical Examiner's Office, Dr. Steven Cogswell, testified that he conducted the victim's autopsy and that he took photographs of entry and exit wounds he found on the victim's body. Dr. Cogswell explained that, prior to taking the photographs, he cleaned the blood from the victim's body and removed items of medical intervention left by the hospital. Dr. Cogswell stated that the first photograph (Exhibit 104) showed the victim's back with two entrance gunshot wounds. The next photograph (Exhibit 105) showed a close-up view of one of the entrance wounds, and Dr. Cogswell explained that the wound was an "atypical

entrance gunshot wound" and "not the usual very clear round to oval shape." He said that the irregularity indicated that the bullet had possibly passed through some object prior to hitting the victim. Dr. Cogswell found that the wound had an abrasion border around it and that this was due to "fabric that [was] actually pressing against the body[.]" Dr. Cogswell testified that the next photograph (Exhibit 106) showed a close-up view of the second gunshot wound to the victim's back. He said that it showed an "entrance defect" and irregular surrounding abrasion border with "a few bits of black fabric material visible."

Regarding the fourth photograph (Exhibit 107), Dr. Cogswell said that it showed a side view of the victim's body with a third gunshot wound. He said that this wound also was an "atypical or shored entrance wound[.]" The next photograph (Exhibit 108) showed a close-up view of the third gunshot wound on the victim's hip, and Dr. Cogswell stated, "This is a little more regular . . . and closer to what we'd expect to see in a gunshot wound that had not previously struck . . . something else." Dr. Cogswell testified that the sixth photograph (Exhibit 109) showed an exit wound on the back of the victim's leg just above the knee. Dr. Cogswell said that the seventh photograph (Exhibit 110) depicted a close-up view of the exit wound and that the wound had an irregular abrasion border, demonstrating that "something pressed up against the skin as the bullet[] pass[ed] through."

Following Dr. Cogswell's testimony, the trial court found that the photographs assisted Dr. Cogswell in explaining the cause and manner of death and corroborated the statements of witnesses. The court noted that the photographs did not show the victim's face and were not "gory or shocking." It concluded that they were not so prejudicial that the probative value was substantially outweighed by unfair prejudice.

**Trial Testimony**

*State's Proof*

CPD Officer Giuseppe Troncone testified that, on the evening of March 2, 2015, he was dispatched to a traffic crash on North Market Street. When he arrived, Officer Troncone observed that a black BMW and a red pickup truck had been involved in a traffic accident. Officer Troncone testified that the BMW had hit a light pole and then hit the rear end of the truck. He saw that emergency medical services were working on the victim, who had been shot. Officer Troncone helped secure the scene and shut down the roadway. Officer Troncone then spoke to the distressed passenger of the BMW, Ms. Thompson, and learned that the victim had been shot behind the Kangaroo Express gas station on Dallas Road. Officer Troncone transported Ms. Thompson to the gas station where he taped off the crime scene and placed markers near several shell casings on the ground. Officer Troncone explained that he obtained a description of the suspect vehicle, a white Ford

Taurus possibly driven by someone named "B.J." He put out a "be on the lookout," or BOLO, for the white Ford Taurus and requested that detectives come to the scene.

Ms. Thompson testified that she was the victim's girlfriend, and she identified a photo of the victim during life, over the objection of Defendant. She said that, before his death, the victim sold marijuana to friends and occasionally to people he did not know. She recalled that the victim picked her up at her residence in his black BMW and that they went downtown, with the victim intending to sell marijuana to someone named "B.J." Ms. Thompson believed that the B.J. referenced by the victim was a white male who had previously purchased marijuana from the victim. Ms. Thompson stated that the victim initially went to the Publix parking lot for the transaction but that there were too many people in the area. The victim communicated with B.J. by text message, and they agreed to meet at CVS, but the victim drove to Walgreens. The victim then called B.J. and directed him to meet behind the Kangaroo Express gas station. Ms. Thompson testified that, after the phone call, the victim said, "B.J. must be with a black guy" because the victim spoke to a black male on the phone, but they were expecting "a white B.J."

Ms. Thompson testified that, once they were behind the gas station, a white Ford Taurus pulled up beside the victim's car and that the victim told the occupants of the white Ford Taurus that they should come over to his car. Ms. Thompson said that two black men wearing hoodies, blue and maroon in color, walked over and got into the back seat of the victim's car. She stated that the man with the maroon hoodie sat behind the victim, while the man in the blue hoodie sat behind her. She recalled that the man in the blue hoodie began talking about the price of the marijuana and that he had some money in his hands. He then reached over to grab the marijuana that was in the victim's hand. The man in the blue hoodie said, "Give me that shit." When the victim refused to comply, the man in the blue hoodie told the man in the maroon hoodie to "[s]hoot his ass." Ms. Thompson testified that the man in the maroon hoodie shot the victim. When she heard the gunshot, she yelled for the victim to drive away. She heard another gunshot as they fled, and then the victim said that he had been shot and "blacked out[.]" Ms. Thompson stated that she had to grab the steering wheel of the victim's car but that they crashed into the back of the pickup truck. She said that the victim was unresponsive and that she used her cell phone to call 911. Ms. Thompson testified that she was later transported to the police department where she was interviewed and then released. She agreed that she was later shown photographic lineups but could not identify Defendant or his co-defendants in the lineups.

On cross-examination, Ms. Thompson agreed that she was on her phone when the two assailants were inside the victim's car discussing the price of the marijuana with the victim. She agreed that, when she testified at Co-Defendant Thompson's preliminary hearing about two weeks after the offense, she stated she was not sure whether anyone tried to grab the marijuana from the victim. However, she asserted

that her memory was better at the time of trial and that the man sitting behind her in the rear passenger-side seat "definitely did try to snatch it."

Gregory Mardis, a crime scene investigator with the CPD, testified that he responded to the scene of the traffic accident on Market Street, where he recorded the scene on video. He recalled that the victim's car had significant damage and that there appeared to be a bullet entrance in the left rear quarter panel behind the passenger door, on the rear driver's side door, and in the back of the driver's seat. He noted a "good deal of blood" where the victim had been seated. He also saw a yellow backpack on the floorboard of the front passenger seat.

Investigator Mardis testified that the victim's car was transported to the police processing bay. While processing the vehicle and its contents, Investigator Mardis opened the yellow backpack and found plastic bags, two jars of marijuana, a tool used for separating marijuana leaves from stems and seeds, small baggies of marijuana that were packaged for resale, and an electronic scale. Investigator Mardis explained that he later responded to the medical examiner's office where he received biological samples from the victim and two projectiles that had been recovered from the victim during autopsy.

After leaving the scene on Market Street, Investigator Mardis went to the scene of the shooting behind the gas station. There, he video-recorded the scene and collected as evidence four CBC 9mm shell casings and a projectile. Investigator Mardis explained that another investigator went to the emergency room at Erlanger Hospital, took photographs of the victim, and collected the victim's clothing.

Sloan Rankhorn, an investigator with the CPD's crime scene unit, testified that he went to Erlanger Hospital on the night of the shooting to document the condition of the deceased victim's body and collect the victim's clothing. Investigator Rankhorn stated that he then responded to the processing bay where he photographed the victim's car and dusted it for fingerprints. Investigator Rankhorn was able to collect several latent prints, including a print on the outside handle of the rear passenger-side door. Investigator Rankhorn testified that he gave the lifted latent print to another officer for examination. Investigator Rankhorn stated that items of clothing were collected from Defendant and his co-defendants following their arrests. He said that investigators collected a red Bulldogs sweatshirt from Defendant and a blue Hollister jacket from Co-Defendant Young.

CPD Sergeant David Franklin testified that he was the supervisor of the department's latent print unit. Sergeant Franklin explained that, on the morning of March 3, 2015, he was called in to examine latent prints that were lifted from the victim's car. He stated that he entered the print from the outside handle of the rear passenger-side door into the Automated Fingerprint Identification System, or AFIS, and that the system provided

Defendant's name as a potential match. Sergeant Franklin then manually compared the latent print to Defendant's known fingerprints and determined that the latent print matched that of Defendant's "left little finger." Two independent examiners then verified Sergeant Franklin's match.

Special Agent Glen Glenn testified that he was a forensic scientist assigned to the forensic chemistry unit of the Tennessee Bureau of Investigation (TBI) crime lab. Agent Glenn stated that he tested that plant material found in the yellow backpack in the victim's car and determined that the material was marijuana with a combined weight of 20.93 grams.

TBI Special Agent Laura Hodge testified that she worked in the crime laboratory's firearms and toolmark identification unit. Agent Hodge explained that, in connection with the investigation into the victim's murder, she received four 9mm Luger caliber cartridge cases, one bullet from the scene of the shooting, and two bullets recovered from the victim at autopsy. She said that her examination showed the three bullets all shared the same class characteristics and similar individual characteristics and that they could have been fired from the same firearm. She noted, however, that no firearm was submitted for testing in this case. Agent Hodge found that the four cartridge cases had all been fired from the same unknown 9mm caliber firearm.

Jayda Mayhue testified that she was Co-Defendant Thompson's girlfriend and that she knew Defendant through Co-Defendant Thompson, who was a long-time friend of Defendant's. She stated that, in March 2015, she was nineteen years old and that Co-Defendant Thompson was seventeen. Ms. Mayhue recalled that, on March 2, 2015, she and Co-Defendant Thompson picked up Defendant at the Washington Hills Recreation Center in Co-Defendant Thompson's white Ford Taurus around 6:00 or 7:00 p.m. Defendant then asked Co-Defendant Thompson to pick up Co-Defendant Young because "they were going to get some weed from some guy." After Co-Defendant Young joined them in the car, they went to North Chattanooga where Defendant began text messaging with someone. Defendant told the group that he had "accidentally text[ed] the wrong number and still got in contact with someone that sold weed." Ms. Mayhue stated that Co-Defendant Thompson first drove to Publix for the transaction but "it was kind of crowded there so they didn't want to meet there because there [were] too many cars." Then, they drove to CVS at the victim's suggestion, but the victim was at Walgreens. Ms. Mayhue recalled, "And then [the victim] text[ed], . . . where y'all at? And we was like, oh, we're at the wrong location. Then that's when it was decided to meet at the place behind the Kangaroo Express [gas station] on Dallas Road." Ms. Mayhue testified that, when they arrived behind the gas station, they pulled up beside the victim's black BMW. She testified that she and Co-Defendant Thompson told Defendant and Co-Defendant Young to go to the victim's car to complete the transaction. Ms. Mayhue said that she looked over and

saw "a girl on her phone" in the front passenger seat of the victim's car. Ms. Mayhue continued, "And [Defendant] gets behind her . . . he never got in the car, he just opens the door. And then [Co-Defendant Young] walked to the other side." She recalled that Co-Defendant Young had on a black jacket and that Defendant had on a blue Nike jacket and, possibly, a red hat. She said that Co-Defendant Young got into the victim's car behind the victim, who was sitting in the driver's seat, and that she and Co-Defendant Thompson remained in their car. Ms. Mayhue said that five or ten minutes later, "[Defendant] opens the door and he's getting in the car, and then we hear gunshots." Ms. Mayhue testified, "[Co-Defendant Young] came running across the front of the car and jumps in the car and everybody just speeds off." Ms. Mayhue said that she asked what happened and that Co-Defendant Young said, "I shot, I shot into the car . . . I thought he was reaching for something." Defendant said that the victim "reached for his glove compartment[.]" Co-Defendant Young also said that it was the "first time shooting [his] gun." She recalled that Defendant yelled at Co-Defendant Young and asked, "[W]hat did you do?" She testified that she did not see any marijuana when Defendant and Co-Defendant Young got back into the car and that she did not see any struggle take place inside the victim's car. She denied hearing anyone say before the shooting that "if the weed didn't sit straight that they were going to take it[.]"

Ms. Mayhue testified that, after the shooting, they dropped off Co-Defendant Young at his girlfriend's house and then she, Co-Defendant Thompson, and Defendant went to Co-Defendant Thompson's brother's home. While there, Ms. Mayhue found a news article about a car accident on North Market Street which stated that "gunshots might have been involved." She testified that she read the article to the group and that "[e]verybody just kind of like freaked out." Defendant was then picked up by his brother, and Ms. Mayhue and Co-Defendant Thompson went to their home. Ms. Mayhue admitted that she did not call police to report the shooting. She said that she learned about the victim's death the following day but that she did not contact law enforcement at that time. Ms. Mayhue testified that, the day after the homicide, she and Co-Defendant Thompson left the white Ford Taurus with a friend named "Tweety," who gave them another car to drive. She said that the starter on the white Ford Taurus had not been working properly and that Tweety had agreed to work on it. She said that she was picked up by police on March 9, 2015, and that she gave a statement to police. In her statement, Ms. Mayhue initially lied to police and said that she had no involvement in the shooting.

Ms. Mayhue stated that, after Defendant's arrest, Defendant called Co-Defendant Thompson from jail. Ms. Mayhue explained that it was "a 20-second call[,]" in which Defendant told them to "tell the truth." Ms. Mayhue agreed that, when Co-Defendant Young got into the white Ford Taurus, he had a backpack. She acknowledged that Co-Defendant Thompson had told her previously that "if [Co-Defendant Young] has a backpack he's armed[.]" She also acknowledged that, in her statement to police and at two

prior court hearings, she testified that she "heard the gunshots and then [Defendant and Co-Defendant Young] ran and jumped into the car." She, nevertheless, insisted that Defendant was getting in the white Taurus when she heard the gunshots.

Detective Christopher Blackwell of the CPD testified that he interviewed Defendant after his arrest in Georgia on March 5, 2015, and the recording of the interview was played for the jury. Detective Blackwell recalled that, after taking Defendant's statement, he charged the co-defendants for their involvement in the victim's murder. He testified that he later located Co-Defendant Thompson's white Ford Taurus at Tweety's Auto Sales car lot.

Dr. Steven Cogswell testified that the victim suffered three gunshot wounds, two to the back and one to the hip. Regarding the individual gunshot wounds, Dr. Cogswell testified consistently with his prior testimony at the jury-out hearing. He then utilized the photographs taken at autopsy to explain to the jury the nature of the wounds. He noted that two of the bullets did not exit the victim's body but that he recovered those at autopsy. He said that a third bullet exited at the back of the victim's leg. Dr. Cogswell stated that the victim's cause of death was multiple gunshot wounds and the manner of death was homicide.

*Defendant's Proof*

Co-Defendant Robert Thompson, called to testify by Defendant, asserted his Fifth Amendment right not to incriminate himself. Defendant then sought to play a recording of Co-Defendant Thompson's sworn testimony given during a transfer hearing for Co-Defendant Young. The trial court allowed the recording to be played.

In the recording of the transfer hearing, Co-Defendant Thompson testified that, on March 2, 2015, Defendant called him and asked for a ride to "go pick up some weed[.]" Co-Defendant Thompson said that he picked up Defendant and that Defendant requested they also pick up Co-Defendant Young because Co-Defendant Young had additional money for the marijuana. Co-Defendant Thompson recalled that they met the victim in a parking lot behind a gas station and that Defendant called the victim and said, "How do you want to do this?" After speaking to the victim, Defendant and Co-Defendant Young got out of Co-Defendant Thompson's car and walked to the victim's car. Co-Defendant Thompson testified that Defendant got into the victim's car and sat in the rear passenger-side seat. Co-Defendant Young also got into the car and sat directly behind the victim. Co-Defendant Thompson stated that the victim "cut on a light in the car and . . . held up a sack of weed." A few seconds later, Co-Defendant Thompson saw "a little commotion" in the victim's car and then heard two gunshots. Defendant and Co-Defendant Young got back into Co-Defendant Thompson's vehicle as the victim drove away from the scene. Co-

- 12 -

Defendant Young told Co-Defendant Thompson that the victim would not give him the marijuana and that he had to shoot him; he also said that he believed the victim was reaching for a gun. Co-Defendant Thompson testified that had not seen a gun but that Co-Defendant Young had a backpack when he got into Co-Defendant Thompson's car. He said that he was unsure if Defendant and Co-Defendant Young took any marijuana from the victim. Co-Defendant Thompson stated that Co-Defendant Young had money that night but that he did not know how much. Co-Defendant Thompson said that he was unaware of any plan to rob the victim but admitted that Co-Defendant Young said, "If the weed is not sitting right, we might have to take it."

After concluding Co-Defendant Thompson's recorded testimony from the transfer hearing, Defendant sought to impeach part of Co-Defendant Thompson's sworn transfer hearing testimony with Co-Defendant Thompson's recorded statement to police, which was provided several days after the crime and prior to the transfer hearing. In his police statement, Co-Defendant Thompson said that he never heard any talk of robbing the victim prior to the offense. Co-Defendant Thompson said that, while sitting in the back of his car, Defendant and Co-Defendant Young determined that they had enough money to purchase the marijuana at the agreed price. He admitted, however, that Co-Defendant Young stated, "[I]f it ain't sitting right, I don't know, I might just have to take it from him." Co-Defendant Thompson told police that he never saw Defendant get into the victim's car; rather, Defendant was standing by the open car door. He explained, "All I s[aw] when I looked over, I saw [Defendant] had the door open and when, like they started shooting, [Defendant] was still standing outside the car." After the victim was shot and both Defendant and Co-Defendant Young returned to his car, Co-Defendant Thompson heard Co-Defendant Young say, "He wouldn't give me the weed, I had to shoot him." Co-Defendant Thompson agreed that Co-Defendant Young always carried a gun in his backpack. He said that he got a twenty-second phone call from Defendant after Defendant's arrest and that Defendant told him to "tell the truth."

Defendant testified that, on March 2, 2015, he was trying to text someone he knew to buy marijuana but ended up texting the victim, whom he did not know but who also sold marijuana. Defendant arranged to buy $160 of marijuana from the victim. He testified, however, that he hoped to talk the victim down on the price because Defendant did not have the full $160. Defendant said that he called Co-Defendant Thompson to come get him and that he asked him to pick up Co-Defendant Young as well.

Defendant testified that he agreed to meet the victim at Publix but that because the area around Publix was so crowded, he suggested to the victim that they meet elsewhere. They agreed to meet at CVS, but the victim mistakenly went to Walgreens. Defendant then told the victim to drive to the Kangaroo Express gas station, which was "a middle meeting point." When they arrived behind the gas station, the victim told Defendant to come to his

- 13 -

car. Defendant testified that there had been no conversations between him and his co-defendants about robbing the victim. He further testified that he was unaware that Co-Defendant Young had a gun. He admitted that they lacked the total $160 needed for the marijuana but hoped to negotiate a lower price.

Defendant stated that he went to the victim's rear passenger side door and that Co-Defendant Young got in the back seat behind the victim. Defendant said that he "just stuck [his] head in" the door to talk to the victim and that he never saw the victim take out any marijuana. Defendant said that he talked with the victim for five to ten minutes about the deal but that the victim never showed him any marijuana. Defendant continued, "I ran out of stuff to ask the man and the vibe in the car just got . . . real weird[.]" He said that, when the victim reached toward the center console, Co-Defendant Young pulled out a gun and pointed it at the back of the victim's seat. Co-Defendant Young said, "[G]ive me that shit." Defendant testified that he was "shocked" and "confused" because there "was no reason for [Co-Defendant Young] to pull the gun out at that time." Defendant said that he pulled his head out of the car and then "stopped." He then "backpedaled" and went back to Co-Defendant Thompson's car. He testified that he did not hear gunshots until he was getting into Co-Defendant Thompson's car. Defendant stated that, when Co-Defendant Young ran back to Co-Defendant Thompson's car, Co-Defendant Thompson "pulled off[.]" Defendant said that he asked Co-Defendant Young why he fired the shots and that Co-Defendant Young replied, "I don't know." Co-Defendant Young also stated that he shot through the victim's seat.

Defendant testified that, when Ms. Mayhue read the news article about the shooting, he called his brother rather than go to police. Defendant said that he was arrested at his brother's home in Georgia three days later. He said that he told Detective Blackwell during his interview that there had been a plan to rob the victim because he "was stressed and . . . hadn't been sleeping[.]" He also stated that he had been smoking marijuana, taking Xanax and sleeping pills, and drinking beer. He testified that, when he mentioned that Co-Defendant Young tried to rob the victim, the police began badgering him and using the word "robbery" to accuse him of the same thing. He insisted, however, that there was never a plan to rob the victim. He said that he and Co-Defendant Young had $130 and that he intended to "talk [the victim] down" from the agreed $160 price.

On cross-examination, Defendant admitted that he destroyed his cell phone a day or two after the shooting because he knew that it could connect him to the homicide. He said that he also destroyed it to avoid capture by police. He agreed that he signed a *Miranda* waiver before talking to police and agreed that he understood the waiver. Defendant testified that he agreed to talk to detectives and that no coercion or pressure was used to force him to give his statement. He agreed that he gave the detectives accurate information regarding his phone number, address, and social security number. Defendant

acknowledged that he brought up the topic of having had a plan to rob the victim and that he said the plan was to "get the weed" and that Co-Defendant Young was going to use his gun to carry out the plan. He said, however, that he just "went with [the detectives'] story." Defendant denied telling Co-Defendant Young to shoot the victim and denied that there was a struggle inside the victim's car. He said that he never saw any marijuana and never "reached for any weed." He said that he provided his statement to detectives to get "a deal" and to "take responsibility for [his] actions." Defendant testified that he tried to "help these detectives out" and stated, "I didn't have to talk to them. It was obviously voluntary—I volunteered to do that. I didn't have to talk to them. I didn't have to tell them who."

After defense counsel stated he had no further questions on redirect examination, without any question from counsel, Defendant spontaneously began speaking to the jury. He said that "nobody knows why this man was shot still to do this day." Defendant continued, "[I]t's the rest of my life and I'm just really not believing it. I tried to help and just wanna—it's not no struggle. It wasn't no struggle, I never seen the weed, and I didn't say shoot him. I wouldn't say anything like that." Defendant then said, "I trust y'all to make the best decision. This [is] the rest of my life is in y'all's hand[s], but I trust y'all to make the right decision."

### Closing Arguments[3]

During closing argument, defense counsel compared Defendant's case to that in the Netflix documentary, "Making a Murderer," and stating, "I'm hopeful that the country is starting to realize that when a young man walks into an interrogation room with two seasoned detectives and gives a confession but he can't articulate any facts to support the confession that it might not be true." Defense counsel further argued, "And do you think that . . . the kid you saw in that video that you heard from today has the wherewithal to set up a plan in a 20-second phone call with these two other individuals and they all get the story exactly the same?"

In rebuttal argument, the prosecutor stated:

> The Chattanooga Police Department did what they were supposed to do. They did their duty. They investigated and located the perpetrators of this crime.
>
> The defense has done their duty. They've defended this man as best they could.

---

[3] We have limited our summary of closing arguments to the portions related to the claims of improper prosecutorial argument raised by Defendant on appeal.

And the State has done its duty. It's presented proof beyond a reasonable doubt. Every element of felony murder and attempted especially aggravated robbery has been proven beyond a reasonable doubt to a moral certainty.

And soon it will be your duty to go back there, weigh the evidence you heard, apply it to the law. And after you do that there will be only one verdict that you can find and that is guilty of first degree, felony murder and attempted especially aggravated robbery.

The prosecutor also referenced the youth of the witnesses, the victim, and Defendant, stating:

You know, I've had this case from the time it started back in March of 2015, and all these people involved in this case are young people. They were back in 2015. And unfortunately I have had the opportunity to watch them grow a little bit. And it struck me[,] as I was sitting there watching [Ms.] Thompson testify[,] that she has become a young woman, that she's no longer the child, the girl, that was sitting in the front passenger seat who, like General Davis said, had a front row seat to felony murder. [Ms. Mayhue] has grown. She's become a young woman. And [Co-Defendant] Thompson, become a young man, coming into adulthood. And even [D]efendant.

But don't be swayed by age. Don't let that enter into your deliberations. You are to have no sympathy or prejudice. You are to conduct yourselves based upon the law and the evidence. And you'll get an instruction with regard to that.

Don't be swayed by [D]efendant's statements up on the stand that this is the rest of his life. That's not evidence. That's improper. It's objectionable. It's not relevant. It's not law. It's not evidence. Don't be swayed by that. Don't be swayed by his pleas of don't do this to me.

If you do, think about [the victim]. Nineteen year[s] old, one month shy of his 20th birthday. His whole life ahead of him. I wonder what he'd look like today. I wonder if he would have that glimmer of adulthood that these other witnesses have had, but we'll never know that.

Following deliberations, Defendant was found guilty as charged, and the trial court sentenced Defendant to life for first degree felony murder. At a subsequent sentencing

hearing, the trial court imposed a concurrent sentence of eleven years for attempted aggravated robbery.

Defendant filed a timely motion for new trial and two amended motions for new trial. Following a hearing, the trial court denied Defendant's request for a new trial. This timely appeal follows.

## Analysis

### Sufficiency of the Evidence

Defendant argues that the evidence presented at trial was insufficient to support his convictions for attempted especially aggravated robbery and first degree felony murder because the State failed to establish that Defendant had the intent to commit robbery at the time the victim was killed and failed to establish that the murder was in furtherance of the robbery. The State responds that the proof of Defendant's guilt was overwhelming.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). A defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2015). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a)

- 17 -

(2015). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2015).

Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2015). As pertinent here, serious bodily injury is defined as "bodily injury that involves" "[a] substantial risk of death"; "[p]rotracted unconsciousness"; "[e]xtreme physical pain"; "[p]rotracted or obvious disfigurement"; "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E) (2015). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2015). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2015).

In its charge to the jury, the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2015). As pertinent to this case, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2015). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

- 18 -

When viewed in the light most favorable to the State, the evidence presented at trial showed that Defendant contacted the victim and arranged a meeting to ostensibly purchase marijuana from the victim. Defendant then called Co-Defendant Thompson, who picked up both Defendant and Co-Defendant Young in his white Ford Taurus and drove them to the site of the transaction. When Co-Defendant Young got into Co-Defendant Thompson's car, Co-Defendant Young had his backpack with him, and Co-Defendant Thompson testified that Co-Defendant Young always carried a gun in his backpack.

Ms. Thompson testified that, when she and the victim arrived at the gas station, two men got out of the white Ford Taurus and into the back seat of the victim's car. Ms. Thompson stated that the man sitting behind her in the rear passenger side seat had some money in his hands and began talking to the victim about the price of the marijuana. He then reached over and tried to grab the marijuana out of the victim's hand, telling the victim, "Give me that shit." When the victim refused to comply, he told the man sitting behind the victim to "[s]hoot his ass." Ms. Thompson testified that the man sitting behind the victim shot the victim. When she heard the gunshot, she yelled for the victim to drive away, and she heard another gunshot as they fled.

Crime scene investigators testified that they found three bullet holes in the victim's car—one in the left rear quarter panel behind the passenger door, one in the rear driver's side door, and one in the back of the driver's seat—and Dr. Cogswell testified that the victim suffered three gunshot wounds, two to the back and one to the hip. Dr. Cogswell stated that the victim died from multiple gunshot wounds and that the manner of death was homicide.

Although Ms. Thompson could not identify the two assailants in photographic lineups, a latent fingerprint matching Defendant's "left little finger" was found on the outside handle of the rear passenger-side door. Additionally, in his testimony at Co-Defendant Young's transfer hearing, Co-Defendant Thompson testified that Defendant got into the victim's car, sitting in the rear passenger-side seat. He stated that he saw some "commotion" in the victim's car and then heard two gunshots. Defendant and Co-Defendant Young then got back into the white Ford Taurus as the victim drove away from the scene. Co-Defendant Thompson admitted that, prior to meeting with the victim, Co-Defendant Young said, "If the weed is not sitting right, we might have to take it."

Moreover, Defendant admitted in his statement to police that he and Co-Defendant Young planned to rob the victim. Defendant said that he was there to play his part in the robbery and that he had to be a "man" but claimed that he was not there to kill the victim. Defendant also said that Co-Defendant Thompson knew they were going to rob the victim because of the text messages. Defendant said that the agreed price for the marijuana had been $160 but explained that he had no money and that Co-Defendant Young only had

$100.  Defendant stated that Co-Defendant Young was in control but admitted that it had been his idea to rob the victim.  Additionally, at trial, Defendant admitted that he accompanied the others back to the home of Co-Defendant Thompson's brother after the shooting.  *See Phillips*, 76 S.W.3d at 9.  Defendant then fled to his brother's home in Georgia, and he destroyed his cell phone after the shooting because he knew that it could connect him to the homicide.  *See State v. Hensley*, 656 S.W.2d 410, 414 (Tenn. Crim. App. 1983) (noting that "any attempt to suppress or destroy or conceal evidence is relevant as a circumstance from which guilt of an accused so acting may be inferred").

Based on the foregoing, we conclude that the proof was sufficient to establish that the victim was shot and killed during an attempted especially aggravated robbery and that Defendant was criminally responsible for Co-Defendant Young's actions.  Defendant is not entitled to relief on this claim.

### Motion to Suppress Defendant's Statements

Defendant asserts that the trial court erred in denying his motion to suppress his statements to law enforcement.  He contends that, under the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, he unambiguously invoked his right to remain silent at the 18:15 time stamp of the recorded interview when he stated, "[L]et me stop talking[,]" and that Detective Blackwell blatantly refused to acknowledge his right to remain silent, eliciting statements from Defendant "that never should have been obtained."  Citing *Edwards v. Arizona*, 451 U.S. 477 (1982), Defendant further contends that he made an unequivocal request for counsel around the 39:00-minute mark of the interview when he said that he and his family were trying to get a lawyer but that detectives continued to interview him in violation of his Fifth Amendment right to counsel.[4]  The State responds that Defendant has waived his suppression claims.

Both the United States and Tennessee Constitutions protect against compelled self-incrimination.  U.S. Const. amend. V; Tenn. Const. art. I, § 9.  In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001).  As part of those safeguards, police are required to inform persons who are subjected to

---

[4] Defendant also cites to statements he made around the 52:00 and 57:00-minute marks of the recorded interview as assertions of his right to remain silent and to a statement made at the time stamp of 57:45 as an unequivocal request for counsel.  However, by agreement with the State at the hearing on the initial motion to suppress, the recorded interview was redacted at the time stamp of 52:27, and the jury did not hear the remaining portion of Defendant's interview.

custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. *Id.* Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained.

*Id.* at 280-81.

In *Edwards*, the United States Supreme Court determined that, once a suspect *asks* for counsel, "additional safeguards" are required to protect the Fifth Amendment right against compelled self-incrimination and announced that:

> when [a suspect] has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A suspect], . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85. Then, in *Davis v. United States*, 512 U.S. 452 (1994), the United States Supreme Court stated that "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459, 461 (emphasis in original). "Whether an individual's request for counsel

- 21 -

is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review." *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013).

There is a "distinction between the *Miranda* Fifth Amendment right to counsel, which is designed to protect against coercion, and the Sixth Amendment right to counsel, which guarantees to a criminal defendant the right to legal assistance in any critical confrontation with state officials, irrespective of coercion." *State v. Willis*, 496 S.W.3d 653, 702 (Tenn. 2016). The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (holding that the Sixth Amendment right to counsel in criminal proceedings applies to states through Fourteenth Amendment). Similarly, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel" and has been interpreted as identical to the Sixth Amendment right to counsel. *See State v. Downey*, 259 S.W.3d 723, 732-33 (Tenn. 2008). The Sixth Amendment right to counsel attaches after the initiation of formal charges. *Maine v. Moulton*, 474 U.S. 159, 176 (1985); *State v. Berry*, 592 S.W.2d 553, 557 (Tenn. 1980). In Tennessee, formal charges may be initiated by an arrest warrant, indictment or presentment. *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings. Interrogation by the State is such a stage." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citations omitted). However, the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. *State v. March*, 395 S.W.3d 738, 767 (Tenn. Crim. App. 2011) (citing *Montejo*, 556 U.S. at 786).

In this case, a review of the record shows that Defendant's Fifth Amendment claims were raised in his original motion to suppress. The trial court granted the motion to suppress, in part, and ordered that the recorded interview be redacted at 52:27 based on the State's concession and after defense counsel's statement that there was no authority to support a request that the entire statement be suppressed. Defendant later filed a second motion to suppress—this time raising a claim of a violation of his right to counsel under the Sixth Amendment. Following an evidentiary hearing on this claim, the trial court denied relief. As noted by the State, Defendant only raised a claim of a violation of his Sixth Amendment right to counsel in relation to the trial court's denial of the motion to suppress in his motion for new trial and amended motion for new trial. Defendant failed to raise his claims of a violation of his Fifth Amendment right to counsel and right to remain silent in a motion for new trial.

- 22 -

Tennessee Rule of Appellate Procedure 3(e), provides, in pertinent part, that:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

*Id.* By failing to raise his Fifth Amendment claims in his motion for new trial, Defendant has waived review of the claims by this court, and he has not requested plain error review. *See id.* Defendant is not entitled to relief.

## Admission of Photographs

### *Autopsy Photographs*

Defendant argues that the trial court abused its discretion by admitting the photographs from the victim's autopsy. He asserts that the photographs were not relevant to any disputed issue and that they were cumulative, a waste of time, and unfairly prejudicial. The State responds that the trial court properly admitted the autopsy photographs.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005). "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et. al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000)). However, relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* at 949. We "need not find that the trial court made the best decision or the one the appellate court would have made" but instead must determine "whether the trial court's decision was within the range of acceptable alternatives." *Willis*, 496 S.W.3d at 729.

Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, *Handbook of Federal Evidence*, 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *Banks*, 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. *Collins*, 986 S.W.2d at 20. Factors to be considered when determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Banks*, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* "As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *Collins*, 986 S.W.2d at 21 (citing *State v. Duncan*, 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. *Banks*, 564 S.W.2d at 951. If the defendant offers to stipulate to the facts shown in the photograph or the defendant does not dispute the testimony that the photographs illustrate, the prejudicial effect is more likely to substantially outweigh the photographs' probative value. *Id.*

Turning to the instant case, the trial court admitted seven photographs from the victim's autopsy (Exhibits 104-110). Prior to taking the photographs, Dr. Cogswell cleaned the blood from the victim's body and removed items of medical intervention left by the hospital. The photographs were limited to the areas of the three gunshot entrance wounds and one exit wound; they did not show the victim's entire body and did not show the victim's face. During a lengthy hearing on the issue, Dr. Cogswell detailed the location of each gunshot wound and explained that the wounds were "atypical" and "not the usual very clear round to oval shape." He said that the irregularity indicated that the bullets had possibly passed through some object prior to hitting the victim. Dr. Cogswell additionally testified that he observed an "abrasion border" around two of the wounds and that this was due to "fabric that [was] actually pressing against the body[.]"

- 24 -

Upon review, the photographs were certainly relevant in that they assisted Dr. Cogswell in explaining the cause and manner of the victim's death and corroborated the statements of witnesses regarding how the victim was shot. Moreover, the photographs were not particularly gruesome, gory, or shocking such that the probative value was substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in admitting the autopsy photographs, and Defendant, therefore, is not entitled to relief.

*Life Photograph*

Defendant contends that the trial court abused its discretion by admitting a life photograph of the victim, asserting that the life photograph was irrelevant and prejudicial. The State responds that the trial court properly admitted the photograph and that, even assuming some error, it did not affect the jury's verdict.

As relevant here, Tennessee Code Annotated section 40-38-103(c) provides: "In a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney general to show the general appearance and condition of the victim while alive." Tenn. Code Ann. § 40-38-103(c) (2017). Despite the statute's mandatory language, a trial court may nevertheless exclude a photograph if the court determines that "its probative value is substantially outweighed by the danger of unfair prejudice[.]" *State v. Glen Allen Donaldson*, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020) (citing Tenn. R. Evid. 403), *perm. app. denied* (Tenn. Sept. 16, 2020). Because such a photograph would be inappropriate, it would be excludable under the statute. *Id.* (citing Tenn. Code Ann. § 40-38-103(c)).

After examining the life photograph of the victim, we conclude that it is relevant, probative, and does not cause unfair prejudice requiring its exclusion under Rule 403 of the Tennessee Rules of Evidence. In *Glen Allen Donaldson*, this court found no error in the admission of a life photograph of the victim, stating:

> The photograph at issue here shows the victim standing alone in a suit and smiling at the camera. Although the victim's identity is not at issue in this case, the photograph is relevant to show the victim's general appearance while alive, and nothing in the photograph is prejudicial to the defendant.

*Glen Allen Donaldson*, 2020 WL 2494478, at *10. Similarly, in this case the life photograph at issue shows the victim in a suit smiling at the camera. There is no indication that the "primary purpose" of the photograph was "to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *See State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim.

App. 1998) (quoting M. Graham, *Handbook of Federal Evidence*, 182-83 (2d ed. 1986)). We conclude that the trial court did not abuse its discretion in admitting the life photograph as the probative value of the life photograph was not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. Defendant is not entitled to relief.

## Improper Prosecutorial Argument

Defendant asserts that the prosecutor engaged in improper argument during closing when the prosecutor mentioned watching the State's witnesses grow up and comparing them to the victim, which Defendant contends was an effort by the prosecutor to "inflame the passions of the jury by eliciting sympathy for the victim." Defendant further asserts that the prosecutor called for the jury to "take retributive action against [him]" by improperly arguing that the jury should "do its duty[,]" which Defendant characterizes as "essentially a plea that its verdict . . . send a message to the community." The State responds that Defendant waived consideration of the claim and that he cannot establish that he is entitled to plain error relief.

A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *Banks*, 271 S.W.3d at 131.

In *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), this court listed five general areas of improper prosecutorial argument during closing: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

*Id.*

As noted by the State, Defendant failed to raise a contemporaneous objection to the two instances of alleged improper argument. The Tennessee Supreme Court has previously stated that "[i]t is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" explaining that a timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010). A defendant's failure to object contemporaneously will constitute a waiver of the issue on appeal. *Id.* at 58 (citing Tenn. R. App. P. 36(a)); *State v. Edward Walsh*, No. M2019-00989-CCA-R3-CD, 2020 WL 5117960, at *11 (Tenn. Crim. App. Aug. 31, 2020), *perm. app. granted* (Tenn. Jan. 15, 2021), *appeal dismissed* (Apr. 13, 2021). Even when a defendant raises the issue in a motion for new trial, the lack of a contemporaneous objection requires that the improper argument be "exceptionally flagrant" and constitute plain error before a defendant is entitled to relief. *State v. Richard Gleason*, No. W2018-01389-CCA-R3-CD, 2020 WL 633111, at *8 (Tenn. Crim. App. Feb. 10, 2020) (citing *State v. Banks*, 271 S.W.3d 90, 132 (Tenn. 2008)), *perm. app. denied* (Tenn. Aug. 10, 2020).

The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one

of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283.

### *1. Duty Argument*

In rebuttal closing argument, the prosecutor stated, "[S]oon it will be your duty to go back there, weigh the evidence you heard, apply it to the law. And after you do that there will be only one verdict that you can find and that is guilty of first degree, felony murder and attempted especially aggravated robbery." Defendant asserts that the prosecutor called for the jury to "take retributive action against [him]" by improperly arguing that the jury should "do its duty[,]" which Defendant characterizes as "essentially a plea that its verdict . . . send a message to the community." However, when viewed in the context of the prosecutor's argument, the prosecutor's statement was not an effort to urge the jurors to exact their personal retribution against Defendant or to send a message to the community. The prosecutor did not suggest that it was the jury's duty to convict Defendant; rather, the prosecutor stated that it was the jury's duty to weigh the evidence and that he believed, when they did so, they would find that the evidence was sufficient to convict. Defendant has not shown that a clear and unequivocal rule of law was breached based on this claim, and therefore, he is not entitled to plain error relief.

### *2. References to Age*

Likewise, Defendant has failed to show that a clear and unequivocal rule of law was breached by the prosecutor's argument about the age of the witnesses and the victim. Defendant argues that the prosecutor's statements were calculated to inflame the passions of the jury. We agree with the State, however, that the prosecutor's comments appeared to be directed at defense counsel's remarks in closing about Defendant's youth and references to Defendant as "a kid," as well as Defendant's spontaneous testimony urging the jury to consider that it had "the rest of [his] life" in its hand referring to the possibility of a life sentence. Even if this qualified as improper prosecutorial argument, consideration of the error would not be necessary to do substantial justice. The evidence against Defendant was strong, and we cannot say that the prosecutor's argument had such an unfair prejudicial impact that it undermined the fundamental fairness of the trial. *Adkisson*, 899 S.W.2d at 642. Accordingly, Defendant is not entitled to plain error relief.

### III. Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE